UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

TONY "TZEWEN" WU,                                 :
                                                  :
                              Plaintiff,          :
                                                  :          1:18-cv-6543-GHW
-against-                                         :
                                                  :          MEMORANDUM OPINION
METROPOLITAN TRANSPORTATION                       :          AND ORDER
AUTHORITY, and METRO NORTH                        :
COMMUTER RAILROAD COMPANY,                        :
                                                  :
                              Defendants.         :

------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 02/07/20

GREGORY H. WOODS, United States District Judge:

Tony "Tzewen" Wu ("Plaintiff" or "Wu") brought this employment discrimination action against Defendants Metropolitan Transportation Authority ("MTA") and the Metro-North Commuter Railroad Company ("Metro-North"), alleging that Defendants discriminated and retaliated against him in violation of the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). Defendants have moved for summary judgment on each of Wu's claims. For the reasons discussed below, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART with respect to Wu's claims for discrimination under the ADA, NYSHRL, and NYCHRL, and is DENIED with respect to Wu's claims for retaliation under the ADA, FMLA, NYSHRL, and NYCHRL.

I.      BACKGROUND

The Court views the facts in the light most favorable to the non-moving party. *See Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012). Unless otherwise indicated, the following facts are undisputed.

Wu works as a Level 4 Database Administrator ("DBA") for Metro-North, a part of the MTA. Plaintiff's Counter-Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, Dkt.

No. 73 ("56.1 Stmt."), at ¶ 1. Wu's responsibilities include "design[ing] and oversee[ing] the installation, configuration, and maintenance of database technologies and resources to ensure that all [Metro-North] application and systems availability targets are met." *Id.* During the time period at issue in this case, Wu suffered from heart issues, an aneurysm, back problems, sleep apnea, and sweat gland cancer. Declaration of Russell S. Moriarty, Dkt. No. 72 ("Moriarty Decl."), Ex. A (Wu Deposition) at 86:25-87:6, 261:17-20.

### A. July 2017 Modified Schedule Request

Wu's troubles with Metro-North in this case[1] began with a dispute over his request for a modified work schedule. In February 2016, Wu sent a request to his supervisor, Kenneth Stubbs ("Stubbs") asking for a "daily schedule change" from his regular schedule of 8:30 a.m. to 5:00 p.m. to a modified schedule of 7:30 a.m. to 4:00 p.m. Declaration of Kenneth Stubbs, Dkt. No. 61 ("Stubbs Decl."), at ¶ 2, Ex. 2 at 4. On February 22, 2016, Stubbs responded that he approved the change and added, "I just sent a copy of the FMLA form in a separate email." Stubbs Decl., Ex. 2 at 4. The documentary evidence in the record does not address whether Wu's February 2016 request for a modified schedule was in fact a request for FMLA leave, although the parties appear to agree that the request was an assertion of rights under the FMLA. Defendants' Memorandum of Law in Support of Motion for Summary Judgment, Dkt. No. 57 ("Def. Mem."), at 22. Stubbs testified that he believed the schedule change was not permanent because he had been told that "there are no permanent FMLAs . . . . [T]hey have to be reassigned, reapproved, so nothing should

---

[1] In December 2014, Wu filed a complaint in the Southern District of New York, asserting employment discrimination claims against Metro-North and Jim Haw, his manager at the time. Declaration of Linda Wong, Dkt. No. 59 ("Wong Decl."), Ex. E. Wu alleged that Metro-North and Mr. Haw discriminated and retaliated against him in violation of the ADA and the Age Discrimination in Employment Act ("ADEA"). *Id.* at ¶ 1. In August 2016, Judge Laura Taylor Swain granted Metro-North and Mr. Haw's motion for summary judgment on Wu's claims. Wong Decl., Ex. F.

go on more than several months." Moriarty Decl., Ex. C (Stubbs Deposition) at 33:12-14. Wu claims that Stubbs never told him the schedule change was not permanent. *See, e.g.*, 56.1 Stmt. at ¶ 4.

On July 13, 2017, Stubbs sent an e-mail to all of the DBAs in the group that he supervised. 56.1 Stmt. at ¶ 5. The email listed each DBA's normal work schedule as it was reflected in Metro-North's timekeeping system, Kronos. 56.1 Stmt. at ¶¶ 3, 5. Stubbs had not established these work schedules, which were already in place when he became manager of the DBA group in 2014. 56.1 Stmt. at ¶ 5; Stubbs Decl. at ¶ 2. Stubbs' email listed Wu's schedule as 8:30 a.m. to 5:00 p.m. Stubbs Decl., Ex. 2 at 6.

Wu responded to Stubbs' email the same day and wrote, "My working hour is 7:30am-4:00pm instead of 8:30am-5:00pm. Plus, LIRR summer schedule change is totally difficult for me. Why do you change my schedule?" 56.1 Stmt. at ¶ 6. Stubbs responded by email about an hour later, stating, "I did not change your hours. This is what is in Kronos. . . . I remember we had a discussion a year or a year and [a half] ago about you changing hours and I said no we need late coverage. Did you get approval from someone else? Please send me the approved document." Stubbs Decl., Ex. 2 at 5. Wu forwarded Stubbs the email from February 2016 in which Stubbs approved Wu's modified work schedule. *Id.* at 4. Stubbs responded, "FMLA is for a limited amount of time and expire[s]. I remember we had a discussion about you changing your time permanently and I said no." *Id.* at 3. Wu then replied, claiming that Stubbs' approval email did not say the change was not permanent, and informing Stubbs that Wu had been working the modified hours since February 2016. *Id.* Stubbs emailed back later on July 13th, stating "I see on the FMLA which is about not being able to come to work you falsely reporte[d] your regular hours were 7:30 to 4:00. When you made the request your hours were from 8:30 to 5:00. I will be sending a question to HR to see if an FMLA can be unlimited." *Id.* at 2. The record before the Court does not contain any indication which FMLA form Stubbs' email was referencing.

On July 18, 2017, Stubbs again followed up with Wu about his work schedule. Stubbs emailed Wu a reminder that his hours were from 8:30 a.m. to 5:00 p.m. and stated that Wu was "expected to work" those hours. Stubbs Decl., Ex. 3 at 2. Stubbs wrote, "Should you wish to request a change to your scheduled work hours, you may submit an ADA Reasonable Accommodation request for consideration," and provided Wu with the name of a person to contact regarding the ADA request process. *Id.* Stubbs also added, "Currently, there is no approved FMLA in effect for you," and informed Wu that if he wanted to apply for FMLA he should "complete and submit the required FMLA forms." *Id.* Stubbs testified that the reason he denied Wu's request for a modified schedule was because the MTA has a general policy to assign at least two DBAs on a shift to monitor its databases in case any problems arise. Stubbs Decl. ¶ 11. Wu claims that this stated reason was pretextual because Stubbs admitted that Wu's absences between 4:00 and 5:00 p.m. never caused any issues for the MTA.[2] 56.1 Stmt. at ¶ 10.

Despite Stubbs' July 2017 emails, Wu continued to work from 7:30 a.m. to 4:00 p.m. 56.1 Stmt. at ¶ 13. Wu did not lose any pay and was not subject to any disciplinary action for refusing to follow the 8:30 a.m. to 5:00 p.m. schedule. *Id.* at ¶¶ 14, 15. In approximately July 2018—after Wu began reporting to a new manager named Sonika Agrawal—Ms. Agrawal approved Wu's modified schedule request. *Id.* at ¶ 16.

## B. Wu's July 2017 EEO Complaint

On July 26, 2017, Wu filed an internal complaint with the MTA Division of Equal Employment Opportunity ("EEO"), alleging that Stubbs had discriminated against him on the basis of age and disability. Moriarty Decl., Ex. D. Wu's July 26, 2017 complaint does not include any

---

[2] Stubbs did not actually testify—as Wu claims—that no coverage-related issues ever occurred after Wu left work at 4:00 p.m. Instead, he testified as follows: "Q. . . . So was there any work-related issues caused by the fact that Mr. Wu wasn't working 'til 5:00 p.m. during that time period? A. I wouldn't be able [to] answer that right now; I would have to go back and look." Moriarty Decl., Ex. C (Stubbs Deposition) at 35:21-25.

details about the bases for Wu's assertions of discrimination. *Id.* A later document entitled "Complaints/Grievance Record," dated August 23, 2017, appears to detail a number of Wu's complaints against the MTA, including claims that Stubbs denied Wu's request for a modified schedule in July 2017 and that Stubbs threatened to deny Wu's sick time request on July 3, 2017.[3] Wu testified that this document was a "complaint that [he] made internally before the MTA." Declaration of Linda Wong, Dkt. No. 59 ("Wong Decl."), Ex. A (Wu Deposition) at 198:17-21. However, based on the record presented, it is not apparent to the Court whether or not this document was intended to supplement Wu's July 2017 EEO complaint.

### C. October 2017 Vacation Dispute

On the morning of October 12, 2017, Fiona Robe ("Robe"), an employee responsible for managing timekeeping and vacation requests, informed Stubbs that Wu had not checked into work on October 9th and 10th. 56.1 Stmt. at ¶¶ 3, 23. Stubbs emailed Wu asking him to explain his absence. 56.1 Stmt. ¶ 24. At 12:10 p.m., Wu responded, "Twu-VP (10/9-13, 16-20)." *Id.*; Stubbs Decl., Ex. 7 at 2. At 12:29 p.m., Stubbs wrote back, "Can you send me [your] original request for vacation again. I couldn't find it." Declaration of Fiona Robe, Dkt. No. 60 ("Robe Decl."), Ex. 1 at 2. Wu did not respond to Stubbs' email. 56.1 Stmt. at ¶¶ 28, 29. Stubbs claims that he "conducted a thorough search" of his inbox, but could not find a vacation request from Wu, and that Robe and another manager named Michael Lyons also could not find such a request. Stubbs Decl. at ¶ 20. Stubbs then emailed the Associate Director of Human Resources and several other employees, stating "I don't think [Wu] submitted a request for vacation. Besides sending it to me he always copies [Robe]. What options are there in dealing with this?" Robe Decl., Ex. 1 at 2. Later that day, Stubbs emailed Wu again, writing, "Earlier I was giving you the benefit of the doubt. No one has

---

[3] There is no evidence in the record supporting the claim that Stubbs threatened to deny Wu's sick time request on July 3, 2017. It is undisputed that Wu was paid for July 3, 2017. 56.1 Stmt. at ¶ 38.

any record of you requesting vacation. You are absent without leave and must return to work. Disciplinary action for not doing so can be suspension to termination." Stubbs Decl., Ex. 8 at 3.

The next day, the Associate Director of Human Resources responded to Stubbs, saying, "It would be difficult to hold him accountable without the facts. Did he in fact request permission from you to take vacation? If so, did you approve it?" Wong Decl., Ex. B (Stubbs Deposition) at 28. The Associate Director also asked whether Wu and other employees knew the process for requesting vacation. *Id.* Stubbs wrote back that Wu did not request vacation and Stubbs did not approve it, and stated that all DBAs "know that they need to send me an email requesting vacation time . . . . For the past 2 years for vacation MNRR DBAs send me a request and copy [Robe]. In the past 3 months I have asked that Mike Lyons a manager that reports to me be copied [in case] I am not available to approve requests. None of the 3 of us was notified that Mr. Wu was not at work." *Id.* The Associate Director responded that Stubbs should put Wu "on notice" if Stubbs was sure that Wu "did not follow proper protocol for requesting vacation." *Id.* at 27.

On October 15, 2017, Stubbs emailed Wu again, writing, "sending this to you again because you have not returned to work and I have not heard back from you." Stubbs Decl., Ex. 8 at 3. Wu did not respond to Stubbs' October 15th email. 56.1 Stmt. at ¶ 29. On October 18, 2017, Stubbs instructed Robe not to pay Wu for the week of October 11th to October 17th because Wu was "absent without permission." Stubbs Decl., Ex. 8 at 2. On October 18th, the Chief of Transport Applications for the MTA sent Wu a letter instructing him to return to work. Stubbs Decl., Ex. 9. The letter stated, "Management has attempted to contact you on several dates and times by phone and email to discern the reason for your unauthorized leave without success," and warned Wu that "[f]ailure to adhere to this directive by October 20, 2017 will result in appropriate disciplinary action, up to and including termination." *Id.*

Stubbs testified that at some point after October 20, 2017, he discovered a vacation request email from Wu in his sent emails folder. Stubbs Decl. at ¶ 24. Wu had sent the email to Stubbs on July 28, 2017, copying Sabrina Primus—who served as a backup for Robe—and Michael Lyons. Stubbs Decl. at Ex. 10. The email stated "TWu–VP (10/9-13, 16-20, 11/30, 12/1, 4, 29). Sabrina, Please help me to check on the status of my FH." *Id.* Stubbs had forwarded Wu's email to Robe on July 31, 2017, asking Robe to "check on" Wu's question about his floating holiday time. *Id.* At his deposition, Stubbs stated that when he received Wu's email in July 2017, he had understood it to be a vacation request. Wong Decl., Ex. B (Stubbs Deposition) at 55:3-5. However, Stubbs testified that he did not take action on the request when he first received it because "when [Wu] put the request in, he asked about the Floating Holiday, so I was waiting to see if he was going to use that as part of his vacation." *Id.* at 55:12-22. Stubbs claims that both Robe and Wu never followed up with him. *Id.*

Stubbs never approved or denied Wu's vacation request. *Id.* at 55:6-11; Stubbs Decl. at ¶ 25. Wu claims that he did not need approval because Stubbs had never denied his vacation requests in the past and because there was no MTA policy that required Stubbs to give Wu written approval for vacation time. *See, e.g.*, 56.1 Stmt. at ¶¶ 29, 34. Stubbs claims that he had instructed all DBAs to request vacation by emailing him and copying Robe and that Wu did not follow this procedure because he did not copy Robe. Stubbs Decl. at ¶¶ 21, 24. Wu denies that Stubbs gave this instruction to the DBAs. 56.1 Stmt. at ¶ 26. Stubbs also testified that he believed the reason he was not able to immediately locate Wu's vacation request email was because of a technical problem with the email system that caused employees to lose certain emails. 56.1 Stmt. at ¶ 37. Wu claims that Stubbs' explanation is implausible because he personally was able to locate the email and the MTA and Metro-North produced the email in discovery. *Id.*

After Stubbs realized that Wu had in fact requested vacation for the days that he did not appear at work, Stubbs immediately notified several employees, including the Manager of Employee Relations and the Chief of Transport Applications for the MTA. 56.1 Stmt. at ¶ 35. Wu was later paid for his ten vacation days. Declaration of Fiona Robe, Dkt. No. 60 ("Robe Decl."), at Ex. 4; 56.1 Stmt. at ¶ 36. On October 26, 2017, Wu filed an additional EEO complaint, alleging that the dispute over his October 2017 vacation pay was retaliation for his earlier EEO complaint. *See* Plaintiff's Memorandum of Law in Opposition to Summary Judgment ("Pl. Mem."), Dkt. No. 71 at 19.[4] It is not clear from the record whether or not Stubbs discovered the email and reinstated Wu's pay before or after Wu filed his complaint.

### D. December 25, 2018 and February 19, 2018 Holiday Pay Disputes

Wu took sick days around the December 25, 2017 holiday because he was hospitalized for a heart attack. Wong Decl., Ex. A (Wu Deposition) at 78:9-25. Based on the terms of the contract between the MTA and Wu's union, Kronos automatically deducts holiday pay if an employee takes sick days before and after a holiday. 56.1 Stmt. at ¶ 39. As a result, Wu was originally not paid for December 25, 2017. *Id.* at ¶ 40. After Wu complained that he should have been allowed to change his "sick day" to a "vacation day," however, the MTA and Wu's union agreed that Wu should be paid for December 25. *Id.* at ¶¶ 40-41. Robe made a historical payroll adjustment to pay Wu for

---

[4] The record regarding Wu's October 26, 2017 complaint is less than clear. Wu cites to two documents to support his claim that he made an EEO complaint on October 26, 2017. The first document is a February 12, 2018 memorandum from the Deputy General Counsel for Employment, Alison MacGregor, sent to Wu in response to his complaints. Moriarty Decl., Ex. G. MacGregor stated that the MTA had investigated the disputes over Wu's October 2017 vacation and December 25, 2017 holiday pay but had concluded that there was "insufficient evidence to support the allegation" of retaliation. *Id.* Her memorandum does not reference any complaints made by Wu on specific dates. *Id.* The second is an email chain between Wu and a woman named Donna Evans on October 26, 2017, in which Wu states "I have more information about this complaint and will send to you ASAP." *Id.* at Ex. Q. The version of the exhibit provided to the Court does not contain any attachments and does not provide any additional information regarding the complaint to which Wu's email referred.

that day.  *Id.* at 41.  Wu then added the dispute over his December 25 holiday pay to his internal

MTA complaint.  Wong Decl., Ex. A (Wu Deposition) at Ex. 42.

Wu also argues that he was initially denied holiday pay for February 19, 2018, and that the

denial was a discriminatory and retaliatory act.  Pl. Mem. at 4.  However, the only evidence that a

dispute even occurred regarding Wu's pay for February 19, 2018 is Wu's less than clear deposition

testimony on this point:  "Q: . . . So isn't it true that you . . . never lost any pay from February of

2018 . . . ?  A.  Oh, I remember, this incident, I try using the FMLA, I using – I tried using FML,

they reject, they using my vacation day to pay, because, you know – union told me because, you

know, before, after the week of the holiday, you cannot using the sick – sick day.  Because I think –

FML, we have a conflict, because FMLA using, you know – we have argument with the union,

because the contract never talking about holiday before, or after holiday, using FMLA, they only

talking about sick day, not to talk about FMLA, because FMLA is a special protection . . . ."  Wong

Decl., Ex. A (Wu Deposition) at 83:3-21.  The parties agree that Wu was in fact paid for February

19, 2018.  56.1 Stmt. at ¶ 42.  Wu's time records do not indicate that he was paid out of his allotted

vacation time; instead, they reflect a pay code of "President's Day" for February 19, 2018.  Robe

Decl., Ex. 6.

### E.  Wu's 2018 FMLA Leave

In January 2018, Wu applied for intermittent FMLA leave from December 25, 2017 to

December 24, 2018.  56.1 Stmt. at ¶ 83.  That application was processed through the MTA's

Business Service Center, and not through Wu's direct supervisors.  56.1 Stmt. at ¶ 84; Wong Decl.,

Ex. A (Wu Deposition) at 97:6-22.  The Business Service Center approved Wu's application on

February 2, 2018.  56.1 Stmt. at ¶ 85; Declaration of Giglia Moldovan, Dkt. No. 64 ("Moldovan

Decl."), at Ex. 3.  Wu's FMLA approval notice indicated that he was required to "substitute or use

paid leave during [his] FMLA leave."  Moldovan Decl., Ex. 3 at 3.  On March 7, 2018, the MTA

informed Wu that his FMLA leave entitled him to receive two days of leave every six months.  56.1 Stmt. at ¶ 86.

On April 17, 2018, an MTA employee emailed Wu that his FMLA leave was increased to one or two days per month.  Wong Decl., Ex. A (Wu Deposition) at Ex. 17.  However, on May 2, 2018, the same employee emailed Wu stating that his leave had been updated to one to two days every three months from April 19, 2018 to April 18, 2019.  Moriarty Decl., Ex. P at 2.  The employee stated that re-certification was needed in ninety days and that this leave decision was made "after a peer to peer with the employee's provider."  *Id.*  Wu responded the same day, asking who made the final decision and also adding, "I refuse to accept this ridiculous decision.  According to MTA/TCU agreement, I can take any SP whenever I need which is absolutely more flexible than FMLA.  I will bring up my complaints for all doctors and MTA/HR to Department of Health (New York State) and Department of Labor (NYS or Federal) for FMLA."  *Id.*  A notice dated May 4, 2018 sent from the Business Service Center to Wu memorialized that Wu was approved for one to two days of FMLA leave every three months.  Moldovan Decl., Ex. 4.  On May 16, 2018, Wu again applied for more extensive FMLA leave, requesting "2-4 per week up to 6-12 months."  56.1 Stmt. at ¶ 89.  The record before the Court does not contain any evidence regarding the results of Wu's May 16, 2018 application.

George Shaw ("Shaw") began directly supervising Wu in March 2018.[5]  Declaration of George Shaw, Dkt. No. 62 ("Shaw Decl."), at ¶¶ 1-2.  In March or April of 2018, Shaw learned that Wu received FMLA leave for medical issues, but Shaw was not aware of the specifics of Wu's medical condition.  56.1 Stmt. at ¶ 46.  Shaw was responsible for approving Wu's requests for sick

---

[5] Shaw directly supervised Wu until July or August of 2018.  At that time, Wu began reporting directly to DBA Lead Sonika Agrawal, who reported to Shaw.  Declaration of George Shaw, Dkt. No. 62 ("Shaw Decl."), at ¶ 2.

days taken under Wu's allotted FMLA leave.  Wong Decl., Ex. C (Shaw Deposition), at 18:13-20:14.

Shaw testified that part of his job was "to track [Wu's] requests for sick days related to FMLA and

ensure he wasn't requesting more than he was given an accommodation for."  *Id.* at 20:12-14.

Shaw's understanding was that at first Wu's allocated leave was one to two days per six months,

which was then updated to one to two days every three months and later changed to one to two

days each month.  Shaw Decl. at ¶ 3.  Evidence in the record suggests that Wu regularly took FMLA

leave in the spring and summer of 2018.  *See, e.g.*, Wong Decl., Ex. A (Wu Deposition) at Exs. 22, 23.

### F.  March 2018 EEOC Complaint

On March 19, 2018, Wu filed a charge of discrimination against the MTA with the U.S.

Equal Employment Opportunity Commission ("EEOC").  Wong Decl., Ex. A (Wu Deposition) at

Ex. 43.  The EEOC received Wu's charge on March 27, 2018.  *Id.*  Wu accused the MTA of

retaliation and discrimination based on his disability status, and reported the time of discrimination

as "July 26, 2017 to present."  *Id.*  Wu's EEOC submission referred to the disputes over Wu's

October 2017 vacation and his December 25, 2017 holiday pay.  *Id.*

On April 26, 2018, the EEOC informed Wu and the General Counsel of the MTA that it

was dismissing Wu's charge because the EEOC was "unable to conclude that the information

obtained establishes violations of the statutes."  Wong Decl., Ex. A (Wu Deposition) at Exs. 44, 45.

### G.  April 5, 2018 Pay Docking Incident

Wu emailed Shaw on April 5, 2018 at 3:46 p.m., "TWU-SP6HR" at 3:46pm.  Supplemental

Declaration of Linda Wong, Dkt. No. 77 ("Wong Supp. Decl."), Ex. B (Shaw Deposition) at 21:2-

13.[6]  Shaw then emailed Robe and Vivekanandam at 3:53 p.m., "Can he just send this e-mail with

this heading both from his work station without seeing me and expect to be paid six hours of sick

---

[6]  This email was not provided to the Court, and the record does not contain the complete correspondence
between Shaw, Robe, and Vivekanandam.  The Court instead relies only on that portion of the email which
was quoted in Shaw's deposition.

pay, this after just returning from vacation?" *Id.* at 21:20-22:9. Shaw stated that he believed a policy existed which required employees to speak to their supervisors in person before leaving work sick, and that Wu may have been in violation of certain rules regarding taking sick pay immediately after a vacation. *Id.* at 22:10-24:2. Wu was originally paid for 3:12 hours of work on April 5th and marked absent without pay for 4:48 hours. 56.1 Stmt. at ¶ 43. Robe testified that Wu was only paid for 3:12 hours "because he had clocked out early without receiving approval by his supervisor." Robe Decl. at ¶ 16. Wu claims he was on FMLA leave during those hours and did not need his supervisor's approval to take leave. 56.1 Stmt. at ¶ 43. After Wu complained, he was paid for the 4:48 hours of leave. Wong Decl., Ex. A (Wu Deposition) at 84:8-23.

### H. April 13, 2018 Sleeping Incident

Murali Vivekanandam ("Vivekanandam"), the Deputy Chief Officer of Enterprise Applications for Application Technology and Shaw's direct supervisor, testified that on April 13, 2018, he walked by Wu's cubicle and observed Wu sleeping at his desk. 56.1 Stmt. at ¶ 53. Vivekanandam then went to find Georgette Jones, the senior manager of human resources, to ask her advice about how to handle the situation with Wu. Declaration of Murali Vivekanandam, Dkt. No. 65 ("Vivekanandam Decl."), at ¶ 2. Ms. Jones and Vivekanandam called Labor Relations and "were instructed to obtain photos of Mr. Wu's behavior." *Id.* at ¶ 3. Vivekanandam took two photographs of Wu, wrote a memorandum of what he had observed, and sent the memorandum and photographs to Ms. Jones. Wong Decl., Ex. A (Wu Deposition) at Ex. 10. Wu denies that he was asleep and claims that he was on his lunch break. Moriarty Decl., Ex. A (Wu Deposition) at 73:2-13. Vivekandam did not attempt to wake Wu and testified that he did not know if Wu was on a break at the time he was observed sleeping. Moriarty Decl., Ex. J (Vivekanandam Deposition) at 24:10-17, 26:21-27:21. As the result of Vivekanandam's report, Shaw issued Wu a Disciplinary Charge for Sleeping on Duty and Assuming the Position of Sleep on May 4, 2018. 56.1 Stmt. at

¶ 55. The charge included a punishment of a thirty-day suspension without pay and a final warning that similar conduct in the future would result in dismissal. Shaw Decl. at Ex. 2.

Wu's union appealed the disciplinary charges. On June 13, 2018, Abigail Sole, Labor Counsel for MTA Labor Relations ("Sole"), upheld Wu's thirty-day suspension and final warning. 56.1 Stmt. at ¶¶ 59-60. Wu's union then pursued a final appeal on his behalf. *See* Declaration of Richard Watson, Dkt. No. 63 ("Watson Decl."), Ex. 3. Richard J. Cairns ("Cairns"), the designee of the Senior Director of Employee and Labor Relations, denied Wu's final appeal in a decision issued on January 18, 2019. *Id.* His decision observed that "the MTA has produced substantial evidence to support the fact that [Wu] was sleeping and assuming a position of sleep while on duty as charged." *Id.* at 5. Cairns also concluded that Wu's defense that he was awake and "deep in thought" when the photos were taken was "not credible" and "unworthy of belief." *Id.* Cairns' decision stated that employees who are found to have committed the offenses of assuming a position of sleep or sleeping while on paid duty are typically dismissed. *Id.* at 6. However, given Wu's "unblemished prior discipline record," Cairns reduced Wu's penalty to "a formal Reprimand and a warning that any future same or similar misconduct may result in an increased penalty up to and including dismissal." *Id.* at 7. As a result of Cairns' decision, Wu was not suspended and did not lose any pay. 56.1 Stmt. at ¶ 62.

### I. May 16, 2018 Internet Usage Incident

On April 11, 2018, Vivekanandam held a meeting with Wu and Wu's union representative. Vivekanandam Decl. at ¶ 9. Vivekanandam stated that the "purpose of the meeting was to discuss [Wu's] use of the internet because several managers had observed [Wu] using the internet for non-work-related activities." *Id.* At the meeting, Vivekanandam gave Wu a copy of the MTA's Computer and Social Media Usage Policy. *Id.*; Wong Decl., Ex. A (Wu Deposition) at 42:17-25. That policy specifically relates to the use of "Computer Resources," which are defined as "items

purchased or leased with MTA Agency funds, or under the custody and control of the MTA." Moriarty Decl., Ex N at 3.

Vivekanandam testified that on May 16, 2018, he called Shaw and asked Shaw to walk to Wu's cubicle with him. Vivekanandam Decl. at ¶ 10. At about 11:45 a.m., Shaw and Vivekanandam observed Wu watching an entertainment video that appeared to be a game show, and Vivekanandam recorded Wu watching the video. *Id.*; Shaw Decl. at ¶ 13. On June 5, 2018, Shaw gave Wu a Disciplinary Charge for Violating MTA's Internet Usage Policy. Watson Decl. at Ex. 4. The charge asserted that the penalty for the violation would be dismissal. *Id.* Wu claims that the "Internet Usage Policy" does not exist, and that, because he was using his personal computer and hotspot internet from his phone, he was not in violation of the Computer and Social Media Usage Policy. 56.1 Stmt. at ¶¶ 65-66; Wong Decl., Ex A (Wu Deposition) at 60:6-16. Wu also asserts that Vivekanandam and Shaw did not attempt to find out whether he was using an MTA computer or the MTA's internet, how long he was watching the video, or if he was on break when he was watching the video. Moriarty Decl., Ex. J (Vivekanandam Deposition) at 66:17-22, 71:10-72:5, 81:24-83:18; Ex. U (Shaw Deposition) at 38:15-21, 40:2-8, 40:23-25. Both Shaw and Vivekanandam admitted that they sometimes used the internet at work for personal reasons. *See* Pl. Mem. at 16-17. Shaw in particular acknowledged that he sometimes watched "non-work-related videos" at work, but did not believe that he had violated any MTA policies. *Id.*

Wu's union again appealed on his behalf. During the appeal process, Sole wrote to Wu, Vivekanandam, and Shaw, "Per the IT Department, no internet usage was recorded on the date in question for Mr. Wu." Wong Decl., Ex. A (Wu Deposition) at Ex. 7. Mr. Wu wrote to Sole the next day requesting a copy of the "MTA IT Internet trace log." Moriarty Decl., Ex. V at 2. Sole responded, "[T]here was no record of internet usage at the time in question. As there is no record, there is nothing to produce to either party." *Id.*

In a decision issued on August 21, 2018, Sole upheld Wu's dismissal.  Watson Decl., Ex. 5.

She noted that after Wu's meeting with Vivekanandam on April 11, 2018, "[i]in an email dated April

12, 2018, [Wu] acknowledged the receipt of [the Computer and Social Media Usage] policy and his

understanding that he must read and adhere to it."  *Id.* at 7.  Sole concluded that "[i]nstead of

correcting his behavior, it is clear from the evidence presented . . . that [Wu] decided to continue to

conduct himself in a manner that violated the clear terms set forth in the MTA's policy."  *Id.*

Wu's union pursued a final appeal on his behalf.  On January 25, 2019, Cairns ruled in favor

of the union and dismissed the charges against Wu.  Watson Decl., Ex. 5.  Cairns concluded that the

Computer and Social Media Usage Policy permits occasional personal use of the Internet, and that

the evidence did not show that Wu was engaged in "excessive" personal usage.  *Id.* at 3-4.  As a

result of Cairns' decision, the charges were expunged from Wu's disciplinary record.  *Id.* at 4.

## J.    May 15, 2018 Dispute with Shaw Regarding Weekly Meetings

On Tuesday, May 15, 2018 at 9:55 a.m., Wu emailed Shaw requesting FMLA leave for

"Physical Therapy" from 2:00 p.m. to 4:00 p.m. that same day.  Wong Decl., Ex. A (Wu Deposition)

at Ex. 21.  At 2:01 p.m., Shaw wrote to Wu in a separate email chain entitled "Weekly MNR DBA

Check In Meeting," stating, "You are expected to attend these meetings each week.  You have not

attended the last 4 meeting[s] by my count.  Arrange your schedule to be at these meetings which are

scheduled during your recorded tour of duty."  Shaw Decl., Ex. 1 at 2-3.  Wu replied, "You never

told us this meeting is scheduled every week and my weekly physical therapy can not depend on

your schedule you like."  *Id.* at 2.  Wu then forwarded Shaw and Vivekanandam an email from Shaw

from May 8, 2018 in which Shaw wrote, "We will not have a weekly meeting this week.  Expect to

have one next Tuesday."  Wong Decl., Ex. A (Wu Deposition) at Ex. 49.  Wu wrote, "This is a good

example.  You can change or cancel scheduled meeting any time without any reason you like.  But,

my doctor appointments can not rely on your schedule." *Id.* At 5:37 p.m., Shaw responded "Approved" to Wu's morning email requesting FMLA leave. *Id.* at Ex. 21.

Shaw emailed Wu again on May 16, 2018, instructing Wu that he was "ordered to attend these meetings which are at a set time each week. They are mandatory for your job and occur during your normal work day. Failure to attend may result in disciplinary action." Shaw Decl, Ex. 1 at 2. Shaw added that "[e]mployees are entitled to time off—scheduled and unscheduled," but that "any absences that can be scheduled should be done so around this meeting." *Id.* Wu wrote back that this exchange was the first time Shaw had confirmed the DBA meeting time and that he would try to arrange the new schedule with his doctor. *Id.* Wu also stated, "Don't use any disciplinary action to threaten me." *Id.*

Shaw testified that he was not aware before May 16, 2018 that Wu had pre-scheduled physical therapy during the meeting time and that he could have adjusted the schedule if he had previously known about Wu's conflict. Shaw Decl. at ¶ 7. Shaw further testified that all the other DBAs attended the meetings, and that Wu and the other DBAs were informed of the meetings through calendar invitations. Wong Decl., Ex. C (Shaw Deposition) at 31:23-32:6.

### K. July 2, 2018 Sleeping Incident

On July 2, 2018, Shaw observed Wu sleeping at his desk for several minutes. 56.1 Stmt. at ¶ 74. Shaw informed Sidney Gellineau, the Chief Information Officer, and David Koehler, the Chief of Transportation Applications, both of whom walked back with Shaw to Wu's desk and observed Wu sleeping. *Id.* Shaw recorded a video of Wu sleeping and provided it to Georgette Jones, the human resources manager. *Id.* On July 20, 2018, Shaw issued Wu a Disciplinary Charge for Sleeping on Duty, Assuming Position of Sleep, Loafing and/or Lounging. 56.1 Stmt. at ¶ 76; Shaw Decl. at Ex. 7. The charge stated that the penalty would be dismissal. Shaw Decl. at Ex. 7.

Wu's union again appealed the disciplinary charges. On October 9, 2018, Sole issued a decision concluding that "there is reasonable cause to believe that [Wu] was sleeping on duty and/or assuming the position of sleep while on duty." Watson Decl., Ex. 8 at 5. She wrote: "In light of [Wu's] disciplinary history, the disciplinary charges and penalty of dismissal is sustained." *Id.* Wu's union again pursued a final appeal on his behalf. Watson Decl., Ex. 9. In his final appeal decision, issued on January 25, 2019, Cairns denied the union's appeal, concluding that the record contained "substantial evidence . . . to support the finding that [Wu] engaged in the misconduct as charged." *Id.* at 6. However, Cairns reduced the penalty to a ten-day record suspension and a warning that future misconduct could result in dismissal. *Id.* Consequently, Wu did not lose any pay and his job duties did not change. 56.1 Stmt. at ¶¶ 80-81.

## II.     LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir.

2008) (citing *Celotex*, 477 U.S. at 323). To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and he "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson*, 680 F.3d at 236 (internal quotation marks and citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted); *see also Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

## III. DISCUSSION

### A. Wu's ADA, NYSHRL, and NYCHRL Disability Discrimination Claims

#### 1. Wu's ADA and NYSHL Discrimination Claims Based on Alleged Adverse Employment Actions

Wu claims that the many alleged adverse employment actions that he suffered from July 2017 to July 2018 were the result of disability discrimination. Defendants argue that they are entitled

to summary judgment because, among other reasons, Wu cannot establish a *prima facie* case of discrimination. The Court agrees with Defendants.

Discrimination claims under the ADA and the NYSHRL are governed by the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Widomski v. State Univ. of N.Y. (SUNY) at Orange*, 748 F.3d 471, 476 (2d Cir. 2014); *see also Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 83 (2d Cir. 2015). Under this framework, "the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. If the plaintiff does so . . . the defendant [must] articulate some legitimate, nondiscriminatory reason for its action. If such a reason is provided, plaintiff . . . may still prevail by showing . . . that the employer's determination was in fact the result of . . . discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (internal quotations omitted).

To establish a *prima facie* case of discrimination under the ADA or NYSHRL, a plaintiff must show (i) that his employer is subject to the statute; (ii) that he is disabled within the meaning of the statute or perceived to be so by his employer; (iii) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (iv) that he suffered an adverse employment action because of his disability. *See Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004); *see also Nelson v. City of New York*, No. 11-cv-2732 (JPO), 2013 WL 4437224, at *6 (S.D.N.Y. Aug. 19, 2013) (applying this test to claims under the NYSHRL). Under the ADA and the NYSHRL, "a plaintiff alleging a claim of employment discrimination [must] prove that discrimination was the but-for cause of any adverse employment action." *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019).

Wu has not established his *prima facie* case of discrimination because he not adduced any evidence that the incidents at issue in this case were the result of disability discrimination. He has not, for instance, put forth evidence that his managers or any other MTA employees ever negatively

referenced his disabilities or made disparaging comments about people with disabilities. *See Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015). Nor is there any indication in the record that Wu was treated "less favorably" than a non-disabled MTA employee who was "similarly situated in all material respects." *Id.* (quoting *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)). Wu's sole argument on this point is that Shaw and Vivekanandam both admitted that they sometimes used the MTA internet for personal reasons, even though Wu was punished for the same type of activity. Moriarty Decl., Ex. J (Vivekanandam Deposition) at 68:9-18; Wong Decl., Ex. C (Shaw Deposition) at 42:2-9. But Wu is not similarly situated to his own supervisors. *See, e.g., Zuffante v. Elderplan, Inc.*, No. 02-cv-3250 (WHP), 2004 WL 744858, at *6 (S.D.N.Y. Mar. 31, 2004) (employee and his assistant were not similarly situated because they reported to different people and had significantly different job responsibilities). Put simply, there is no evidence in the record that any Metro-North employees involved in the events at issue in this case were motivated by any discriminatory animus towards Wu. Wu's claims—which at their core allege that he was mistreated "because [he] had exercised rights protected by the ADA," *see* Complaint at ¶ 63—sound in retaliation, not discrimination. Accordingly, Defendants' motion for summary judgment on Wu's ADA and NYSHL discrimination claims based on alleged adverse employment actions is granted.

## 2. Wu's NYCHRL Discrimination Claims Based on Alleged Adverse Employment Actions

Although "courts must analyze NYCHRL claims separately and independently from any federal and state law claims," a plaintiff bringing a claim under the NYCHRL must still "show[ ] that the conduct [complained of] is caused by a discriminatory motive." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109-10 (2d Cir. 2013). The plaintiff must show that discrimination played a role in the employer's decision-making. *See Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 75-76 (2d Cir. 2015); *Philip v. Gtech Corp.*, No. 14-cv-9261, 2016 WL 3959729, at *10 (S.D.N.Y. July 20, 2016) (holding that the federal, state, and city "statutory standards as to

causation are coterminous"); *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 837 n.8 (S.D.N.Y. 2013) (similar).

As the Court has discussed, Plaintiff has offered no evidence that raises a reasonable inference that any of Defendants' employees were motivated by an intent to discriminate against Wu on the basis of his disability. Thus, for the reasons discussed above, Defendants' motion for summary judgment is also granted as to Wu's NYCHRL disability discrimination claims based on alleged adverse employment actions.

### 3. Wu's ADA Discrimination Claims Based on Failure to Accommodate

Wu argues that Defendants violated the ADA by failing to provide reasonable accommodations for his disability. In support of this claim, he points to two incidents: first, Stubbs' refusal to provide him with a modified schedule in July 2017 and, second, Shaw's decision to order Wu to attend weekly meetings after Wu informed Shaw that he attended physical therapy during the regular meeting time. Defendants have largely failed to address these claims. Accordingly, Defendants' motion for summary judgment on Wu's ADA discrimination claims based on Defendants' failure to accommodate is denied.

Disability discrimination under the ADA, NYSHRL, and NYCHRL includes a failure to provide an employee with a reasonable accommodation for his or her disability. *See Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 183-84 (2d Cir. 2006); *see also Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 73 (S.D.N.Y. 2016). These types of claims are also analyzed using the burden-shifting scheme set forth in *McDonnell Douglas*. *McDonnell v. Schindler Elevator Corp.*, No. 12-cv-4614 (VEC), 2014 WL 3512772, at *4 (S.D.N.Y. July 16, 2014). To establish a *prima facie* case of discrimination based on a failure to accommodate, and thus shift the burden to the defendant to articulate a legitimate, non-discriminatory reason for its conduct, a plaintiff must show by a preponderance of the evidence that "(1) he is disabled within the meaning of [the relevant statute];

(2) his employer is a covered entity; (3) he could perform the essential functions of his job with an accommodation; and (4) the defendants refused to provide such an accommodation despite being on notice." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 73 (2d Cir. 2019) (quoting *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96-97 (2d Cir. 2009)).

Significantly, "[t]he ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000) (quoting 29 C.F.R. § 1630.2(o)(3)). The mere failure to engage in the interactive process is not, however, an "independent violation of the ADA." *Nazario v. Promed Pers. Servs. NY Inc.*, No. 15-cv-6989 (LGS), 2017 WL 2664202, at *7 (S.D.N.Y. June 19, 2017). Instead, a court must follow "a two-step process to evaluate whether the failure to provide a proposed accommodation constitutes a violation of the ADA. First, the plaintiff bears the burden of proving that an accommodation exists that permits her to perform the job's essential functions. If the plaintiff meets that burden, the analysis shifts to the question whether the proposed accommodations is reasonable; on this question the burden of persuasion lies with the defendant." *Jackan*, 205 F.3d at 566 (internal alterations omitted). If an employee "cannot show that a reasonable accommodation existed at the time of his [or her] dismissal," the employee cannot recover. *McElwee v. Cty. of Orange*, 700 F.3d 635, 642 (2d Cir. 2012).

Defendants for the most part do not address Wu's failure to accommodate claims as separate claims, instead choosing to treat them as identical to Wu's discrimination claims based on adverse employment actions. Defendants thus inaccurately conflate two distinct theories of liability under the ADA. *See Berger v. New York City Police Dep't*, 304 F. Supp. 3d 360, 368 (S.D.N.Y. 2018) ("Discrimination claims under the ADA may be brought under a theory of adverse employment action or of failure to provide reasonable accommodation."). To the extent that Defendants argue for summary judgment on these claims, those arguments are contained entirely in a single paragraph

of their briefing, under the header "Plaintiff's Alleged Disability was accommodated." Def. Mem. at 6. But Defendants' arguments do not address the specific failures to accommodate at issue here; instead they merely assert that "Wu has never been denied the time he has requested . . . . to visit his doctors, for physical therapy, and for his medical conditions." *Id.* That argument disregards the two specific incidents that form the basis of Wu's failure to accommodate claims. Wu has put forth evidence that he was in fact denied the schedule change and meeting time accommodations he requested.

Defendants arguments on reply fare no better. With regard to the schedule change issue, Defendants once again simply treat Wu's failure to accommodate claim as though it was identical to his adverse employment action claims. Reply Memorandum of Law in Support of Motion for Summary Judgment, Dkt. No. 76 ("Def. Rep. Mem."), at 5. Defendants' argument on this point wholly fails to engage with the standard for failure to accommodate claims, instead simply arguing that the denial of a schedule change is not an adverse employment action. And with regard to Wu's claim concerning the weekly meeting, Defendants argue that, had Wu informed Shaw that he attended physical therapy during the time of the weekly DBA meeting, he and Shaw could have adjusted Wu's schedule or changed the time of the meeting. But the evidence in the record, viewed in the light most favorable to Wu, belies Defendants' argument. It instead indicates that, after Wu informed Shaw that he attended physical therapy during the regularly scheduled meeting time, Shaw disregarded that information and ordered Wu to attend the weekly meeting. Shaw Decl, Ex. 1 at 2. Defendants therefore have failed to demonstrate that—at least in these two incidents—Wu's disability was reasonably accommodated.

Defendants have raised two additional arguments regarding Wu's ADA, NYSHRL, and NYCHRL claims generally that affect the analysis of his failure to accommodate claims. First, Defendants have argued that Wu is estopped from basing any claims on Stubbs' July 2017 decision

to deny Wu a modified schedule because that issue was already decided against Wu in prior litigation. Def. Mem. at 12. As noted above, Wu filed a case in December 2014 asserting employment discrimination claims against Metro-North and Jim Haw, his manager at the time. Wong Decl., Ex. E. In her 2016 decision granting summary judgment to the defendants in that case, Judge Swain found that Metro-North's 2013 decision to deny Wu's modified schedule request was not discriminatory or retaliatory because it was based on legitimate, non-pretextual reasons. *Wu v. Metro-N. Commuter R.R. Commuter R.R. Co.*, No. 14-cv-7015 (LTS) (FM), 2016 WL 5793971, at *13 (S.D.N.Y. Aug. 4, 2016). Despite the similarities in the substance of the request at issue in Wu's previous litigation and this case, the Court finds that Wu is not precluded from asserting a failure to accommodate claim based on the July 2017 denial. Judge Swain's finding that the 2013 denial was not discriminatory or retaliatory does not bar Wu from arguing that, four years later, he again requested a reasonable accommodation in the form of a modified schedule and was denied.

Second, Defendants argue that Wu is barred from raising any ADA claims for events occurring after February 19, 2018, because he failed to exhaust his administrative remedies by including those events in his EEOC complaint. "Ordinarily, a plaintiff seeking to bring a claim pursuant to the [ADA] . . . must exhaust administrative remedies" by filing a charge of discrimination with the EEOC. *Soules v. Connecticut Dep't of Emergency Servs. & Pub. Prot.*, 882 F.3d 52, 57 (2d Cir. 2018). "In this [C]ircuit, however, 'claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency.'" *Id.* (quoting *Shah v. N.Y. State Dep't of Civil Servs.*, 168 F.3d 610, 614 (2d Cir. 1999)). "Subsequent conduct is reasonably related to conduct in an EEOC charge if: (1) the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination; (2) it alleges retaliation for filing the EEOC charge; or (3) the plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge."

*Id.* (quoting *Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir. 2002)); *see also, e.g., Williams v. New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006); *Zagaja v. Vill. of Freeport*, No. 10-cv-3660, 2015 WL 3507353, at *13-15 (E.D.N.Y. June 3, 2015).

Wu has put forth evidence that, within a little over two months of the date that Defendants were provided with notice of his EEOC complaint, he was served with three different disciplinary notices and was denied a reasonable accommodation with regard to the weekly meetings. *See* Sections I.H-K, *supra*. As discussed in greater detail below, he has thus put forth sufficient evidence for a reasonable jury to find that those actions were retaliation for his EEOC complaint, and thus that they were reasonably related to the conduct in his EEOC complaint. Defendants' reply briefing entirely fails to address this argument. *See* Def. Rep. Mem. at 3-4. Accordingly, the Court finds that Wu is not barred from asserting ADA claims based on the allegedly retaliatory events which occurred after February 19, 2018. Defendants' motion for summary judgment on Wu's ADA discrimination claims based on Defendants' failure to accommodate is denied.

### B. Wu's ADA, NYSHRL, and NYCHRL Retaliation Claims

Wu also argues that Defendants violated the ADA, the NYSHRL, and the NYCHRL by retaliating against him after he engaged in protected activity under the statutes. Defendants do not deny that Wu's July and October 2017 EEO complaints and his March 2018 EEOC complaint qualify as protected activity under the ADA, NYSHRL, and NYCHRL. Instead they argue that Wu has not suffered an actionable adverse employment action under the statutes, that there is no causal connection between Wu's complaints and Metro-North's actions, and that Metro-North's actions were based on legitimate, non-retaliatory reasons. For the reasons discussed below, Wu has established a triable issue of fact on each of these issues, at least for his claims relating to his

October 2017 vacation and the 2018 disciplinary charges.[7]  Defendants' motion for summary

judgment on Wu's ADA, NYSHRL, and NYCHRL retaliation claims is therefore denied.

Retaliation claims brought under the ADA, NYSHRL, and NYCHRL are also analyzed

under the *McDonnell Douglas* burden shifting framework.  *Nieblas-Love*, 165 F. Supp. 3d at 65-66, 74-

75; *see also Kemp v. Metro-N. R.R.*, No. 04-cv-9926 (RWS), 2007 WL 1741256, at *16 (S.D.N.Y. June

14, 2007), *aff'd*, 316 F. App'x 25 (2d Cir. 2009).  "[T]he plaintiff must establish a *prima facie* case of

retaliation by showing: '(1) participation in a protected activity; (2) that the defendant knew of the

protected activity; (3) an adverse employment action; and (4) a causal connection between the

protected activity and the adverse employment action.'"  *Hicks*, 593 F.3d at 164 (quoting *Jute v.

Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).  "In the context of an ADA retaliation

claim, an adverse employment action is an action that 'could well dissuade a reasonable worker from

making or supporting a charge of discrimination.'"  *Bien-Aime v. Equity Residential*, No. 15-cv-1485

(VEC), 2017 WL 696695, at *7 (S.D.N.Y. Feb. 22, 2017) (quoting *Hicks v. Baines*, 593 F.3d 159, 165

(2d Cir. 2010)); *see also Forrester v. Corizon Health, Inc.*, 278 F. Supp. 3d 618, 627 (E.D.N.Y. 2017), *aff'd*,

752 F. App'x 64 (2d Cir. 2018) (applying same standard to NYCHRL claim).  "A causal connection

in retaliation claims can be shown either '(1) indirectly, by showing that the protected activity was

followed closely by discriminatory treatment, or through other circumstantial evidence such as

disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through

evidence of retaliatory animus directed against the plaintiff by the defendant.'"  *Littlejohn*, 795 F.3d at

319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).  If the plaintiff sustains

---

[7]  As indicated above, the record regarding Wu's October 2017 complaint and the December 25, 2017,
February 19, 2018, and April 5, 2018 pay disputes is muddled at best.  The parties appear to agree that
relevant events occurred on those dates but have not provided the Court with basic documentation
concerning those events.  Because Wu's ADA, FMLA, NYSHRL, and NYCHRL claims must proceed to trial
on other grounds, the Court reserves judgment regarding whether the December 25, 2017, February 19, 2018,
and April 5, 2018 incidents also form a basis for Wu's retaliation claims.

his initial burden of demonstrating a *prima facie* case, "a presumption of retaliation arises." *Hicks*, 593 F.3d at 164 (quoting *Jute*, 420 F.3d at 173).

At the second step of the *McDonnell Douglas* analysis, the burden then shifts to the defendant to rebut the presumption of retaliation "by 'articulat[ing] a legitimate, non-retaliatory reason for the adverse employment action.'" *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70 (2d Cir. 2015). "If the defendant provides such an explanation, 'the presumption of retaliation dissipates.'" *Id.* (quoting *Jute*, 420 F.3d at 173).

At the third and final step of the analysis, "[t]he plaintiff must . . . come forward with [proof that the] non-retaliatory reason is a mere pretext for retaliation." *Misas v. N. Shore-Long Island Jewish Health Sys.*, No. 14-cv-8787 (ALC) (DCF), 2017 WL 1535112, at *9 (S.D.N.Y. Apr. 27, 2017) (internal quotation omitted). To satisfy this burden, "the plaintiff must prove 'that the desire to retaliate was the but-for cause of the challenged employment action,'" *Ya-Chen Chen*, 805 F.3d at 70 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013)), and "not simply a 'substantial' or 'motivating' factor in the employer's decision." *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (citing *Nassar*, 133 S. Ct. at 2526, 2533). "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.* at 846. (citations omitted). "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.*

As noted above, Defendants argue that they are entitled to summary judgment on Wu's ADA, NYSHRL, and NYCHRL retaliation claims because Wu has not suffered an actionable adverse employment action under the statutes, because there is no causal connection between Wu's

complaints and Metro-North's actions, and because Metro-North's actions were based on legitimate, non-retaliatory reasons. The Court addresses each of these arguments in turn.

Wu suffered adverse employment actions sufficient to support a claim for retaliation both when he was threatened with termination in October 2017 and when he was served with three disciplinary notices in May, June, and July 2018. Defendants' primary argument on this point is that Wu could not have suffered an adverse employment action because he never lost pay or was demoted. Def. Mem. at 15-17. But Defendants' argument relies exclusively on cases from the discrimination context, where a plaintiff claiming that she has suffered an adverse employment action must show that she experienced a "materially adverse change in the terms and conditions of employment." *Zoulas v. New York City Dep't of Educ.*, 400 F. Supp. 3d 25, 53 (S.D.N.Y. 2019). That is not the standard for an adverse action in a retaliation claim. *See Hicks*, 593 F.3d at 165 ("[I]t is now clear that . . . anti-discrimination and anti-retaliation [claims] 'are not coterminous'; anti-retaliation protection is broader and 'extends beyond workplace-related or employment-related retaliatory acts and harm.'" (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67 (2006))). A jury could appropriately conclude that the formal notices which Wu received in October 2017 and in May, June, and July 2018 were sufficient to "dissuade a reasonable worker from making or supporting a charge of discrimination." *Bien-Aime v. Equity Residential*, 2017 WL 696695, at *7; *see Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 227 (E.D.N.Y. 2014) ("A formal reprimand can be an adverse action for purposes of a retaliation claim, 'even when . . . the letter does not directly or immediately result in any loss of wages or benefits, and does not remain in the employment file permanently,' because 'it can reduce an employee's likelihood of receiving future bonuses, raises, and promotions, and it may lead the employee to believe (correctly or not) that his job is in jeopardy." (quoting *Millea v. Metro–N. R. Co.,* 658 F.3d 154, 165 (2d Cir. 2011))).

Defendants also argue that Wu has failed to establish a causal connection between his complaints and the adverse actions he suffered, focusing primarily on the gap in time between Wu's July 26, 2017 complaint and the October 2017 vacation dispute. Citing cases holding that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line," *Ruhling v. Tribune Co.*, No. 04-cv-2430 (ARL), 2007 WL 28283, at \*23 (E.D.N.Y. Jan. 3, 2007), Defendants argue that the two-month-and-sixteen-day gap between Wu's protected activity and the October 2017 dispute precludes Wu from establishing causation as a matter of law. Def. Mem. at 18-19. The Court disagrees. "The Second Circuit has purposefully avoided drawing a bright line rule concerning temporal proximity to enable a court to 'to exercise its judgment about the permissible inferences that can be drawn . . . in the context of particular cases.'" *Walters v. MedBest Med. Mgmt., Inc.*, No. 14-cv-572 (LEK) (ATB), 2015 WL 860759, at \*9 (N.D.N.Y. Feb. 27, 2015) (citing *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013)). Here, the record evidence suggests that Stubbs was made aware of Wu's vacation request as early as July 28, 2017—a mere two days after Wu filed his complaint—and that Stubbs failed to respond to that request. Stubbs Decl. at Ex. 10. There is also evidence that Wu may have supplemented his EEO complaint at the end of August. Wong Decl., Ex. A (Wu Deposition) at 198:17-21. Viewing the record in the light most favorable to Plaintiff, the Court cannot conclude as a matter of law that the approximately two-and-a-half-month time gap between Wu's protected activity and the claimed retaliation is insufficient to establish causation.[8]

Finally, Defendants argue that they have put forth legitimate, non-retaliatory reasons for their actions and that Wu cannot show those reasons are pretextual. The Court again disagrees.

---

[8] With regard to Wu's retaliation claims based on the disciplinary actions instituted against him in late spring and early summer 2018, Defendants do not even raise an argument as to causation. As the Court previously noted, within only a little over two months of Metro-North's receipt of notice that Wu had filed an EEOC complaint, Wu was subjected to three different disciplinary notices.

The record evidence shows that Wu's vacation request was emailed to both Stubbs and Lyons and was then forwarded to Robe in July 2017. Stubbs Decl. at Ex. 10. In light of this evidence, a reasonable jury could discredit Stubbs' testimony that he, Lyons, and Robe each diligently searched their emails and were unable to locate Wu's vacation request when it was discovered that Wu had not swiped in at work on October 10, 2017. Stubbs Decl. at ¶ 20. With respect to Wu's 2018 disciplinary charges—particularly the internet usage charge—there is also evidence in the record from which a reasonable jury could conclude that Shaw and Vivekanandam's stated justifications for the charges were pretextual. In particular, Wu has put forth testimony and documentary evidence supporting his claim that he did not actually violate the Computer and Social Media Usage policy, and that Shaw and Vivekanandam were made aware during the course of his disciplinary proceedings that there was no record of Wu using the MTA internet at the time of the alleged offense. *See* Wong Decl., Ex. A (Wu Deposition) at Ex. 7 (email from Sole to Wu, Vivekanandam, and Shaw). Shaw himself also admitted that he sometimes watched "non-work-related videos" while at work and that he did not believe his behavior would violate any MTA policy. Pl. Mem. at 16. Additionally, neither Shaw nor Vivekanandam made any effort to determine whether Wu was on a break during the times that he was observed sleeping and watching a video, nor did they speak to Wu about his behavior before charging him with discipline. Based on this evidence, a reasonable jury could conclude that Stubbs, Shaw, and Vivekanandam's proffered explanations for their actions were not credible, and thus a pretext for retaliation. Defendants' motion for summary judgment on Wu's ADA, NYSHRL, and NYCHRL retaliation claims is denied.

### C. Wu's FMLA Retaliation Claims

Finally, Wu also claims that Defendants retaliated against him for exercising his rights under the FMLA. Claims for retaliation under the FMLA are subject to substantially the same standard as claims for retaliation under the ADA. *Spaulding v. New York City Dep't of Educ.*, No. 12-cv-3041

(KAM) (VMS), 2015 WL 12645530, at *41 (E.D.N.Y. Feb. 19, 2015), *report and recommendation adopted*, 2015 WL 5560286 (E.D.N.Y. Sept. 21, 2015) (citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 177 (2d Cir. 2006)). Defendants have again argued that Wu's claims for retaliation under the FMLA should be dismissed because Wu has failed to put forth sufficient evidence that he suffered an adverse employment action, that there is a causal link between his protected activity and the allegedly retaliatory acts, or that Defendants' stated reasons for disciplining Wu were pretextual. Def. Mem. at 22-25. For the reasons discussed above, those arguments are unpersuasive. Wu was repeatedly served with notices of discipline during a period of time in which he was regularly exercising his rights under the FMLA by taking intermittent leave. A reasonable jury could find that Defendants' stated reasons for that discipline were pretextual. Defendants' motion for summary judgment on Wu's FMLA retaliation claims is denied.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART with respect to Wu's discrimination claims under the ADA, NYSHRL, and NYCHRL, and is DENIED with respect to Wu's retaliation claims under the ADA, FMLA, NYSHRL, and NYCHRL. The Clerk of Court is directed to terminate the motion pending at 56.

SO ORDERED.

Dated: February 7, 2020
New York, New York

_____
GREGORY H. WOODS
United States District Judge